All right, our next case is 20-2058 United States v. Joe Gallegos, Mr. Atkin. Good morning. May it please the court. Good morning, counsel. My name is Gregor Atkin. I represent Joe Gallegos in this appeal. There's been a lot of discussion today about the Adrian Burns murder as well as the Frank Castillo murder. But maybe to continue with the momentum here a little bit, I'll go briefly over Adrian Burns, the problems with the lack of, or the problem with the evidence of the Adrian Burns murder. It had been about eight years since they had been a part of the gang. There was no evidence that they had, I mean, that they'd been out, they'd been out of prison. This is a prison gang. They were out of prison. They were in and around Los Lunes, Belen, New Mexico, and making a living both by selling scrap metal and selling drugs to feed their habit. And there's no evidence that the gang was even really aware of where they were, what they were doing. They didn't, there's no evidence that they were communicating with the gang. And when it comes to the disrespect, the big mouths comment, there's no evidence that the gang knew about the comment. There's no evidence that the gang knew about the disrespect or the murder. Mr. Gallegos did not make any effort. It was kind of flipping things on its head when counsel said that they didn't take any steps to hide it. People don't usually just, and that's kind of reversed. The purpose, the element here is whether their purpose was to take credit. So the fact that they took no steps to take credit kind of defeats the point, defeats the case. He had to take credit, one way or another, or he was not, that wasn't his purpose. And he made no effort to do that. All the people that have been described as being in and around this event weren't part of the S&M. There was one person who came to check up and see, had heard, but he went to Joe Gallegos. And he wasn't, he was described in the testimony as a former gang member. The big mouths, I'm sorry? Who is that that you're referring to? I think his name was Willie. I can't remember his last name, but his name was Willie. It's in the Big Mouths. The Big Mouths kind of is another issue standing on its own or independent because yes, the Big Mouths comment, when I first heard it, I thought, well, you take that as meaning somebody let something out that was supposed to be kept secret. But it could be taken in more than one way. But it's supposed to be in reference to somebody that he has an ongoing relationship with. And I would suggest that it's too far a leap or too speculative to say that this was in reference to that particular thing. But even if the court allows that, even if the court were to decide that that's sufficient to make that connection, it still comes back to the fact that it doesn't make it a gang incident because ultimately we're still getting back to it's a purpose. It's a question of purpose. And if he doesn't, if he just doesn't communicate with anybody but his brother, because he's his brother about this thing, he's not trying to take credit for it. He's not doing it for that purpose. The fact that it was found in a vehicle, the fire, all that kind of thing, there's no connection between that and the gang. The community of drug people or whatever, there's no evidence that that would send a message that this was, this might send a message, I don't think there's any evidence to send a message that it was Joe Gallegos, let alone the gang. So there's no, but I need to talk about, well, in this context, there's, the government relies a lot on the idea that this was expected of the gang. And when someone is disrespected, they have to act in this, they have to do this. And it reminds me, well, the phrase that has been used, we're talking about the purpose element, which, you know, maintain or increase your position, which for shorthand would just say status, their status with the gang. That is, that is the question, is there purpose status? And the phrase has become, if it's an integral aspect of gang membership, then that would show, if doing this thing, doing this murder was an integral aspect of gang membership, then that would be sufficient. And so there's, so there's the Smith case that says that. And that's why in the briefs I went back and, and the purpose of what my argument there is that that's not entirely a complete statement. It doesn't go far enough to address the purpose element, as was, and adopting that formulation, the Tenth Circuit relied on cases from the Second Circuit. And when we go back to those Second Circuit cases, we see that it is integral aspect of gang membership and a failure to do so would implicate that person's status, lose status or what have you. There has to be a logical connection. That integral aspect of gang membership is not a substitute for the legislative language. It's an aid to help us understand it. It ultimately has to come back to that logic of, was this nevertheless the purpose of this person? So, you know, the immediate case that the Tenth Circuit looked at was the Thai case. That was the BTK gang and born to kill. And same kind of deal. They were, they killed, they tortured and so forth. But the Second Circuit looked and said in a particular case, they couldn't find that connection because there was no evidence that the gang was expecting this, no evidence that the gang even knew that the wrong building had been bombed, on and on and on. I've got to move on to the Frank Castillo matter. But there is that, there is, there's the fact that the SNM expected people to retaliate by itself is not enough. There has to be some other evidence that says that this expectation motivated this defendant in this case. And there is none of that in, in the Adrian Burns murder. Let me ask you this, if we were to agree with you and say there was insufficient evidence of the SNM connection for Andrew and Joe Gallegos, what does that do to Joe's conviction on the Castillo?  Castillo. Massive murder. They don't overlap. They don't overlap in this, because that was, that was something where it was ordered by the gang. And he was, in the Frank Castillo case, the Frank Castillo murder was ordered by the gang. So I don't have the same argument there. This is a different. I'm not asking if you have the same argument. I'm asking, is it, is that conviction impacted if we were to say there was insufficient evidence on Burns? I would, I don't have the time to think about it, but I probably would have to think about it because it doesn't come to mind how those two relate to me, Your Honor. Okay. Well, they were tried together. So I guess it's a question of whether they should have been tried together or whether he was prejudiced by the introduction of evidence on the Burns matter in the conviction on the prison murder. Thank you, Your Honor. Yes, I, there definitely would be an issue there of that prejudice. I didn't have an appeal. In fact, it wasn't an issue that I identified in the record of having those things being severed, having taken those separately. As far as the Frank Castillo murder is concerned, again, it's about the purpose. And he, the testimony was that he had to kill Frank Castillo and there were kill teams put in place to kill him if he didn't. And so it doesn't have to be his primary purpose. His gang status doesn't have to be his primary purpose in committing a murder. It does have to be his general purpose. I believe that the government heard in this case and that they really just prosecuted him for murder and took for granted the fact that, and they looked at the fact that you don't have a self-defense defense. You don't have a duress or that kind of a defense, rather. Excuse me, you don't have a duress defense there. But that just means that they could prove the murder in that particular element. But they have the same burden of proof for each one of the elements of the Vicar murder. In this murder, though, it's very clear that it was a gang-sanctioned murder, right? It was. But the question is, it was gang-sanctioned. It was gang-sanctioned. But the question is, was his purpose to, was his purpose status or was his purpose to stay alive? Well, couldn't it be both? By committing the murder, he stays alive because he's fixed his status. According to the testimony, there was a green light on him and that once he committed the murder, there was no longer a green light on him. The problem in a situation where there is a very credible threat of immediate death if you don't do this murder is that it, is that that becomes the obvious purpose. And even if the jury didn't believe that part, the other part is there has to be evidence. For example, he could have volunteered. That would be evidence. Or he could have expressed interest in this kind of thing of being able to earn his chance to get back in good standing. You know, something like that. He never expressed any interest in this. So even though it's possible in theory to have both where you have kill teams in place and you have that threat of death and being willing to do it anyway, the government still has to give you that evidence of the other reason. The government still has to give you the evidence of the purpose, that that status was the reason. And it's very difficult to do in a case where there's a credible immediate death threat there. And that's because that wasn't his purpose. So yes, it's difficult to prove. If there are no other questions, I'll reserve the rest of my time. Thank you, counsel. Hey, police court. Richard Williams for the United States. As this court pointed out in the Kamihili case, though the motive may have been partly personal, the jury could also have found that Mr. Toki acted with the integral and essential purpose of promoting the gang and maintaining or advancing his position in the gang. Turning first to Castillo where the argument before ended, the evidence was sufficient that Mr. Gallegos' motivation for doing that was to maintain his position in the gang. Mr. Jaramillo testified that Joe told him and DeLeon they were going to kill Castillo. That was after Mr. Lujan testified to Joe what they were going to do. Jaramillo also testified that they were going to do it, how they were going to do it, and what everyone's role was going to be in it. Jaramillo testified that Joe said that if they got caught, not to worry, because his family would take care of an attorney. And Joe said, don't take a DNA test. Leonard Lujan, who was the one who put together the team upon Billy Garcia's order, testified he chose Joe and the others because they hadn't earned their bones. This supports the inference that the S&M motivation was present and Joe was motivated to please the S&M leaders. Furthermore, there was evidence that Joe was proud of what he had done. Shortly after the murder, while he was sitting at a table with a person named Lorenzo Torres who testified, and then Angel DeLeon, another one of the hands-on assailants, he appeared to be proud of what he had done in showing off the cut on his hand. Torres described him as being arrogant as usual. And then even subsequent to that, Ben Clark, another S&M member, testified that Gallegos had told him when they were talking about Arturo Garcia, an S&M leader, who at the time had wanted Joe killed, Joe said, after everything I've done for the S&M, after killing Poncho, this is what they're going to do, indicating that he had killed Poncho for the S&M. That's at 5905. The evidence was sufficient that Joe killed Castillo because it was an integral aspect of his membership and he was expected of him by virtue of his membership. If there are no questions regarding Castillo, I will turn back to the Burns case. So with respect to Adrian Burns, the person that came and talked to Joe shortly after the murder and heard about it was Willie Romero. And he testified that he was a former S&M member and that he had heard Joe killed Burns and was afraid Joe wanted to kill him, 5263. When Romero asked what happened to Burns, Joe said, mind your own business. He didn't say I didn't do it. He didn't deny it. But he also didn't brag about it and say, I want credit for this. Tell the gang I did this. He didn't articulate to Romero that, but I would submit the fire and the staging of the body announced what had happened. Joe Gallegos also told Morgan Ramirez regarding the murder that the bullet got stopped by a bone in his ear and after they shot him, they burned him in his car and then he used the pun about Adrian Burns. There was a question about the evidence of Joe's membership. The evidence was ample that Joe Gallegos was an S&M member. Mr. Cordova testified to it, Mr. Lucero, Mr. Torres, Mr. Rivera. In addition, Jose Gomez testified to the conversation with him about ordering the green light. Mario Rodriguez testified that when Joe was introduced to him after their arrest in this case, 2015, he was introduced as a carnal, meaning as an S&M member. The exhibits in Joe's blood out rule of the gang that there was ample testimony about. With respect to the message being communicated, I would note what I've noted before and that is that Sleepy was told to deliver the message and Sleepy is who is at the Gallegos trailer when Amber gets there. That in combination with the statement about Mother Effers with Big Mouse, that's what happened. I think it was sufficient for the jury to draw the inference that that message was communicated. That takes us back to the question of whether or not this was personal or whether or not this was gang related. That's where I would urge that all of the other evidence in this case indicates that it was gang related. It may have also been personal, but that they were expected to do it by the gang as an integral part of their membership. Violent retaliation and disrespect. Brothers helping each other. Getting another brother involved in committing the crime. The violent way in which it was done. The way in which the body was staged to send a message. Context of drug trafficking. The fact that it was not spontaneous. It appears to have been premeditated. Andrew bought gas beforehand. They got Burns to come to their trailer. It does not appear to have been a thing that just happened at the moment, that it was premeditated. The fact that they did not keep it a secret. That Sleepy knew something about it. He knew not to tell Amber to stay away. Jason Van Beegle helped him dispose of the evidence. Joe told Shawna Gutierrez later that if I ever go to jail, it's because of Jason. S&M member Willie Romero already talked about the fact that it was not in their personal interest to have killed their drug dealer. Certainly not to have killed their drug dealer in this way. The ample evidence about punishing disrespect. Gerald Archuleta Sticks, the former leader, said respect is the reason S&M exists, both in prison and on the streets. 77-52. Archuleta said disrespect was dealt with every single time. Mario Rodriguez testified if someone disrespects the S&M or one individual from the S&M, they disrespect the whole ride. Wasn't there also testimony that not every act of disrespect required you to kill the person? And there was testimony that you had to get permission to actually kill a person. Leonard Lujan testified, I believe, about the waitress or the family member. And I believe he's the one who testified about needing orders. But there was other evidence from other people of circumstances in which prior authorization or orders weren't obtained. And I would distinguish the waitress scenario in the same way I distinguished the road rage or domestic violence from a circumstance where you have multiple gang people involved. It's done in a way that's very public, that it's premeditated, and that it happens within the context of the S&M mission. Another suggestion that the S&M doesn't kill people outside of prison. There was an event outside of prison, the barbershop murder. Jacob Armijo testified to assaulting people who had disrespected Angel Munoz. Cordova, of course, testified to beating his wife because it was expected of him. And on that point, I would note again that Billy Cordova testified that S&M comes before everything, including family. And so while the Gallegos brothers were biological brothers, the fact that they were both S&M is significant in that they were both brought into doing this. There was an example in the briefs of a CPA who does work on the side for a church without specifically being authorized or specifically seeking credit from his employer. And I would suggest that the facts that are missing in that context is a large public event indicating the work, like the bonfire in this case, a third party's involvement in the work, that the CPA didn't tell somebody else to help him dispose of the evidence of the work, that it was necessarily or not expected by the employer to have done the work. All those facts that were present here with the S&M by virtue of members' complete allegiance to it and to the rules that disrespect is not to be tolerated and is to be responded to violently every single time. If there are no other questions. Thank you, counsel. We have some rebuttal time for Mr. Acton. Thank you. Just a couple of points. The exempts that were given about the cut on the hand or saying after killing Poncho, you would think, that sort of thing, those were after the fact. And I noticed from the Barbado case, in 22, I think it's in my reply brief, whether the predicate act of violence in fact had the effect of enhancing the member's position is irrelevant if that result was not a motivating purpose for the defendant's violent action. So in this case, if you have Joe Gallegos who's never done anything like that before, has never expressed any interest in doing so, and is forced to do it, and he's in bad terms with the gang to begin with, and he's forced to do this thing, the question is whether or not he would have done it without that force. And there was no evidence that he would have done it without that force. When there is the force, then after the fact, you could say, well, I get credit for that. That doesn't mean that was what motivated him at the time. That's irrelevant to what motivated him at the time. If he had his There was no evidence that he would have done it without that force. So evidence after the fact that he wanted to take credit, since he was forced to do it, might as well get paid, so to speak. That's not evidence that that was what was motivating him to do it. He was forced to do it. The other thing about the CPA analogy, counsel talked about a large event. Again, this large event, I don't know how anybody would look at that and see SNM. I mean, the Kama Hele case. What was the evidence about the setting the car on fire and the burning of the body? Well, he was shot and then they brought him in the car to the forest area called the Bosque, and he was not actually in the car. I think he was found next to the car. They burned it, but there was no... My question is going to more of what kind of spectacle was this? Was it a deal where a lot of people would see it, or was it hidden away where someone was going to find it at some point, but it wasn't that big of a spectacle for someone, just for everyone to notice? It was the kind of thing that somebody from a distance would say, look, there's smoke in the Bosque, call the fire engine. And they'd have to go in and find that place where they'd follow the smoke, and they would find it, and they would not find, and did not find any insignia of the SNM of any kind. Thank you. Thank you, counsel. Time's expired. You're excused. The case shall be submitted, and the court will be in recess until further notice. Thank you. The court is in recess. The case is over. Thank you.